## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICK DEAN BRINKMAN, | Civil No. 06-4530 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| ANDERSEN CORPORATION, | |
| Defendant. | |

Stephen M. Thompson and Tammy P. Friederichs, **FRIEDERICHS & THOMPSON, PA**, 1120 East 80th Street, Suite 106, Bloomington, MN 55420, for plaintiff.

David M. Wilk, **LARSON KING, LLP**, 30 East Seventh Street, Suite 2800, St. Paul, MN 55101-4922; David A. Schooler, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402; for defendant.

Plaintiff Patrick Brinkman brought this action alleging sex and age discrimination under Title VII and the Age Discrimination in Employment Act (ADEA), after defendant Andersen Corporation ("Andersen") outsourced his help desk position in October 2005. Brinkman also alleges that Andersen retaliated against him because he complained of sex and age discrimination. Andersen has now brought a motion for summary judgment. For the reasons discussed below, the Court grants Andersen's motion.

# BACKGROUND[1]

Brinkman worked for Andersen from 1986 until October 2005, advancing from factory worker to a position with Andersen's computer help desk.  Prior to 2004, Brinkman had no apparent disciplinary problems at Andersen and he received several awards and pay increases.  In early 2004, Karen Cherry was assigned as the new supervisor of the computer help desk group.  Cherry was 12 years older than Brinkman, who was approximately 41 years old at the time of the alleged discriminatory conduct.

Brinkman alleges that in the summer of 2004 Cherry began treating him differently from his younger, female co-workers.  During group meetings, for example, Cherry responded to Brinkman's comments in a demeaning manner, but responded to his younger female colleagues in a positive way.  Brinkman alleges that, on one occasion, he complained to Cherry about his co-workers and Cherry responded by telling him that he did not know all the facts and was a "tattletale."  On July 20, 2004, Cherry sent an email to all help desk employees on how to improve customer service.  Brinkman sent an email response to Cherry and the other help desk employees questioning Cherry's assessment of the issue.  Cherry responded in an email to Brinkman that it was inappropriate for him to send his comment to all help desk employees.  Brinkman alleges that Cherry's response was a personal attack on him, that Cherry was discriminating against him, and that he told Cherry that he felt her behavior was discriminatory.

---

[1] For purposes of this summary judgment motion, the Court considers the facts in a light most favorable to Brinkman, the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In July 2004, Brinkman reported these concerns to Andersen's Senior Human Resources Generalist, Lynn Moseley.  Brinkman told Moseley that Cherry called him a tattletale and had personally attacked him.  Moseley told him to work the issue out with Cherry.  Brinkman alleges that Moseley should have looked into the issue, but stated that he did not believe Moseley's conduct was discriminatory.  Brinkman also had meetings with Cherry and Moseley in the late summer and early fall of 2004.  Brinkman alleges that during these meetings Cherry gave him demeaning looks, and that Moseley repeatedly sided with Cherry, telling Brinkman once again to try to resolve the matter with Cherry.

In September 2004, Cherry gave Brinkman a performance review that identified three areas for improvement: adapting to change, utilizing facts, and communicating concerns appropriately.  Brinkman received an overall rating of "needs improvement," meaning that Brinkman's performance "did not meet expectations in one or more critical aspects of the job."  (Wilk Aff., Ex. 8 at 7.)  The review also required Brinkman to create an action plan for improving his performance, and stated that unless Brinkman's performance improved, "he may not have a future in the new Service Desk organization." Brinkman did not lose any pay or benefits as a result of the performance review.

Brinkman alleges that this performance review was "false."  According to Brinkman, during a meeting with Cherry after the performance review, he asked Cherry for specific examples to support the findings in the review, but Cherry declined to comment further.  Brinkman alleges that Cherry could not recall specific complaints from Brinkman's co-workers to support the performance review.

In October 2004, Brinkman met with Kathy Boisjoli, Andersen's Director of Information Technology, to discuss concerns he had with the performance review and with Cherry's alleged discriminatory behavior.  Boisjoli suggested that she, Cherry, and Brinkman meet to discuss the review, but Brinkman initially rejected the suggestion.  Shortly after that meeting, Boisjoli and Cherry met to discuss Brinkman's performance review.  Cherry shared various emails and other documents in support of the review, and Boisjoli determined that the review was accurate.  Boisjoli then met with Brinkman and told him that she agreed with the performance review and that Brinkman should improve his performance as suggested.  Brinkman alleges that Boisjoli was harsh and demeaning and not open to his concerns during this meeting.

Following this meeting, Brinkman's computer access was modified to allow Andersen to track his computer application activity separately from his co-workers.  Brinkman alleges that Andersen was monitoring his computer use to build a case against him.  In November 2004, Andersen discovered that computers used by Brinkman and by a 33-year old female employee were not properly configured to require periodic password changes.  Andersen conducted an audit of the two computers and discovered that the computer program requiring such changes had been disabled.  Andersen's Information Risk Manager, Amy Holum, and Moseley met with Brinkman and the female employee to notify them of the security breach.  Brinkman alleges that Holum and Moseley accused him of violating a computer policy by resetting the password configuration, when in fact Brinkman had brought the password issue to their attention in the past.  Neither

Brinkman nor the female employee was disciplined.   However, Andersen monitored Brinkman's computer use for a period of time consistent with corporate policies.

According to Brinkman, because Moseley and Boisjoli had not been responsive to his discrimination complaints, he reported his concerns to Sherry Gydessen, Moseley's supervisor.   Gydessen did not conduct any investigation in response to Brinkman's compliant, but rather told Brinkman that he should let the issue go.

In early 2005, Boisjoli hired Jay Junker to work in the IT Department and to help determine whether Andersen should outsource its help desk functions.   Junker was also responsible for helping to improve Brinkman's performance.   Brinkman and Junker met in March 2005 to discuss Brinkman's workplace concerns.   At that meeting, Brinkman told Junker that he heard from other managers that Boisjoli had issued a mandate to give certain employees negative performance reviews.   Junker asked Brinkman which manager had told him this, and Brinkman refused to answer.   Junker told Brinkman that he considered any manager a coward if they knew of such a mandate and failed to report it.   Brinkman alleges that Junker's comment was a personal attack on him.   Brinkman further alleges that Junker generally responded with demeaning and discriminatory comments.   When Brinkman inquired about the meaning of a portion of the performance review stating that Brinkman needed to ask more "open ended questions," Junker replied, "For God's sakes, you're 40 years old. You should know what that means."   (Brinkman Dep. at 301.)   Junker also asked Brinkman if he was having issues with his mother, told him to seek counseling, and told him that he wasn't acting rationally.

In March 2005, Brinkman met with Andersen's Human Resources Manager Julie DuBois and told her that he was being sexually harassed.  DuBois believed Brinkman's allegations needed to be investigated.  DuBois also told Brinkman that he needed to work with Cherry to improve his relationship with her, and that he needed to let go of the performance review issue.  Doug Ramseth, Director of Human Resources, conducted the investigation.  According to Brinkman, Ramseth said, "I'll tell you right now it's not sexual harassment but I'll look into it."  (Brinkman Aff. at 440.)  Ramseth's investigation found no support for Brinkman's allegation that there was a mandate to give a limited number of employees negative performance evaluations.  Ramseth also determined that Brinkman's computer had been monitored as a result of a security breach, that Brinkman's "needs improvement" rating was supported by facts, and that there was no evidence that Brinkman had been discriminated against.  Brinkman alleges that Ramseth conducted a sham investigation to gather additional evidence against him.  When Brinkman objected to Ramseth's conclusions, Ramseth told Brinkman that he should stop rehashing old issues and move forward.

Ramseth also suggested that Brinkman meet with Mary Carter, Andersen's Senior Vice President for Human Resources.  Carter initially supported Ramseth's findings but agreed to conduct her own investigation when Brinkman informed her that he was considering a complaint with the Equal Employment Opportunity Commission ("EEOC").  Carter asked Brinkman to hold off on the EEOC complaint until she could look into his allegations.  Carter followed up on Brinkman's concerns, but found no

support for his discrimination claims, concluding that Brinkman was sensitive to feedback and felt wronged as a result of the "needs improvement" rating.

Around this time, Carter changed Brinkman's performance review rating from "needs improvement" to "unrated." Andersen contends that because it had decided to outsource its help desk functions, Brinkman's rating was changed to improve his chances of finding other employment within Andersen after the outsourcing. Andersen gave hiring preference to applicants who were scheduled to lose their jobs as a result of the outsourcing.

Brinkman remained dissatisfied with Andersen's responses to his complaints. In June 2005, Brinkman contacted Kathy Becker in Andersen's legal department and asked whom he should talk to regarding the alleged discrimination. Becker told Brinkman she would look into the matter and get back to him. Within a short time of this inquiry, Brinkman alleges that Junker told him to stop wasting corporate time and resources pursuing the matter, and that his failure to do so could lead to disciplinary action.

In July 2005, Andersen announced that it would outsource its help desk on October 5, 2005, to allow its IT department to focus on other priorities. Brinkman applied for one employment position in Andersen, but did not receive an offer of employment because the position had been filled. Also during this time, Andersen discovered that Brinkman was accessing non-company email accounts from company computers in violation of Andersen's computer policy. Brinkman received a written warning but did not lose any pay or benefits. Given Brinkman's prior security breaches,

however, as well as his access to sensitive corporate information, Andersen decided to monitor plaintiff's computer use with monitoring software.

On August 30, 2005, Brinkman filed a charge of discrimination with the EEOC, alleging that he had been discriminated against on the basis of sex and age, and that Andersen retaliated against him after he complained about his treatment.[2]   Andersen received notice of the EEOC charge by letter dated September 7, 2005.   On September 23, 2005, Brinkman met with Carter and members of Andersen's executive committee.   During this meeting, Andersen's corporate legal counsel, Alan Bernick, confirmed Brinkman's EEOC charge and told Brinkman that the charge "put them in an awkward position."   Brinkman was also given an opportunity to explain his allegations. Committee members told Brinkman they would look into the matter and get back to him.

Brinkman's last day had been scheduled for October 5, 2005, the date the computer help desk was to be outsourced.   In late September, Andersen determined that Brinkman had deactivated the monitoring software that had been installed following Brinkman's earlier computer policy violation.   Brinkman disputed that he had deactivated the software, claiming that new anti-virus software installed on his computer resulted in the blocking of the monitoring program.   Brinkman alleges that Andersen ignored his explanation and concluded that he had deactivated the monitoring software.   Around this time, Carter and other executives determined that, in light of Brinkman's increasingly

---

[2] The EEOC ultimately determined there was no support for plaintiff's charge of age and sex discrimination, finding that women and employees under the age of 40 received ratings of "needs improvement," and had their computers monitored and access restricted.

disruptive behavior and to eliminate any further security breaches, Brinkman should no longer report to work as of September 29, 2005.

Andersen's computer help desk employees, including Brinkman, remained on the payroll until October 5, 2005, and were offered severance pay and benefits in the event they did not find other employment with Andersen. Brinkman declined any severance pay or benefits. Andersen's outsourcing impacted 47 employees at the help desk. Twenty of the associates, including men older than Brinkman, found other employment at Andersen. Twenty-seven employees including Brinkman did not find other employment, and their positions were terminated on October 5. Half of the terminated employees were older than Brinkman, and half were younger. Nine of the terminated employees were women.

Brinkman brought this action against Andersen on November 11, 2006. Brinkman alleges that Andersen discriminated against him on the basis of his sex and age, in violation of Title VII and the ADEA. Brinkman further alleges that Andersen retaliated against him after he complained of age and sex discrimination.[3] Defendant then filed this motion for summary judgment.

---

[3] Brinkman initially alleged an additional claim against Andersen under the Minnesota Human Rights Act. Brinkman voluntarily dismissed that claim on March 8, 2007.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate in the absence of any genuine issue of material fact and when the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.    SEX AND AGE DISCRIMINATION CLAIMS

Federal law prohibits employers from discriminating against employees on the basis of sex or age.  42 U.S.C. § 2000e-2(a)(1) (Title VII); 29 U.S.C. §§ 623(a)(1), 631(a) (ADEA).  The Court evaluates discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *LaCroix v. Sears, Roebuck & Co.*, 240 F.3d 688, 693 (8th Cir. 2001).  Under *McDonnell Douglas*, the plaintiff has the burden of establishing a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  If the defendant meets

this burden, the plaintiff then bears the burden of demonstrating that the defendant's stated reason is a pretext for discrimination. *Id.* at 804.

In cases involving a "reduction in force" rather than the replacement of an employee, a plaintiff may make out a prima facie case of age or sex discrimination by establishing (1) he is within a protected group; (2) he met the applicable job qualifications; (3) he suffered an adverse employment action; and (4) there is some additional evidence that age or sex was a factor in the employer's action.[4] *Stidham v. Minnesota Min. & Mfg., Inc.*, 399 F.3d 935, 938 (8th Cir. 2005). Andersen does not contest that Brinkman is a member of a protected group,[5] or that he met the applicable job qualifications for the help desk position. Instead, Andersen contends initially that the only possible adverse employment action here is Brinkman's termination. Brinkman responds that the following incidents also constitute adverse employment actions: his September 2004 "needs improvement" rating; the fact that Cherry "brushed him off" and "reprimanded" him for taking time to test a computer system and asking too many

_____

[4] Brinkman objects to application of the four-part test required to establish a prima facie case in reduction in force cases. According to Brinkman, he was effectively terminated on September 29, 2005, before the scheduled reduction in force. Thus, Brinkman argues that the fourth element of "additional evidence" applicable in reduction in force cases should not be required here. *See Ward v. Int'l Paper Co.*, 509 F.3d 457, 461 (8th Cir. 2007) ("Additional evidence is a necessary part of the prima facie case in the RIF context."). However, as discussed below, the Court disagrees that the September 29, 2005 suspension was an adverse employment action. Further, there is no evidence that Brinkman's position remained open after his discharge or that Andersen sought applicants with similar qualifications to fill the position, as required in a non-reduction in force age discrimination claim. *See Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994). Similarly, as discussed below, there is insufficient evidence giving rise to an inference of sex discrimination, as required for a prima facie case of sex discrimination. *See Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007).

[5] The Court notes that the ADEA applies only to individuals at least 40 years of age. *See* 29 U.S.C. § 631(a). Brinkman was 41 years old at the time of the alleged conduct.

questions; that he was falsely accused of tampering with the password configuration on his computer; and that he was given a separate account log for access to a computer software program.

Defendant responds that some of these allegations were not reported to the EEOC within the 300-day statute of limitations period for discrimination claims. The Court agrees. To preserve federal claims of sex or age discrimination, a plaintiff must file a Charge of Discrimination with the EEOC within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e); *Tademe v. St. Cloud Univ.*, 328 F.3d 982, 987 (8th Cir. 2003). Brinkman conceded at oral argument that the 300-day period would encompass only those employment actions occurring in and after October 2004. Thus, the Court finds that the alleged instances of discrimination occurring prior to October 2004 are outside the statutory limitations period and cannot form the basis of a prima facie case. These include Cherry's alleged conduct and comments toward Brinkman in the summer of 2004; Cherry's calling Brinkman a "tattletale"; and the September 2004 "needs improvement" performance review.[6]

---

[6] Brinkman also argues that these incidents should be considered under a "continuing violations" theory. *See, e.g.*, *Madison v. IBP, Inc.*, 330 F.3d 1051 (8th Cir. 2003). However, the continuing violation theory allows consideration of evidence occurring outside the statute of limitations only for the purpose of assessing a hostile work environment claim, or a claim involving a series of acts that constitute the discrimination claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) (concluding that continuing violation theory applies only to hostile work environment claims); *Lipka v. Potter*, No. 03-381A, 2006 WL 839421, at *4 (W.D.N.Y. Mar. 28, 2006) (stating that "the continuing violation doctrine applies only to cases of alleged hostile work environment or other claims which involve a series of acts necessary to comprise the alleged discriminatory act"). Brinkman has not asserted a hostile work environment claim.

(Footnote continued on next page.)

As to the remaining allegations, Andersen contends that the actions are either not adverse, or that there is no evidence linking the actions to Brinkman's age or sex. "[A]n adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *LaCroix*, 240 F.3d at 691; *see also Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001) ("Proof of an adverse employment action requires a tangible change in duties or working conditions that constitute a material disadvantage.") (internal quotations omitted).  The Court finds that Brinkman's allegations that he was falsely accused of deactivating computer software, and that Andersen subsequently monitored his computer use, do not amount to an adverse employment action.  Brinkman has pointed to no evidence suggesting that these actions led to a tangible change in benefits, salary, or some other material employment disadvantage. *See Tademe v. St. Cloud Univ.*, No. 00-1725, 2001 WL 1584593, at **10-11 (D. Minn. Dec. 10, 2001) (finding negative evaluations and monitoring of employee's computer use did not constitute a material employment disadvantage).

Nor is the Court persuaded that placing Brinkman on administrative paid leave constitutes an adverse employment action, particularly where, as here, the action came just three working days before his scheduled termination date.  It is undisputed that Brinkman retained full pay, benefits, and the opportunity to collect a severance package during the three days prior to his scheduled termination date. *See Singletary v. Mo. Dep't*

---

(Footnote continued.)

Accordingly, the Court finds that the alleged incidents from the summer of 2004 are barred by the statute of limitations.

*of Corrs.*, 423 F.3d 886, 891-92 (8th Cir. 2005) (finding no adverse employment action where plaintiff was placed on paid administrative leave and maintained his pay, grade, and benefits).  Further, Brinkman was no longer considering other employment options at Andersen at this time, and his October termination was all but certain.  Thus, of the alleged incidents, the Court finds that only Brinkman's termination on October 5, 2005, constitutes an adverse employment action for purposes of a prima facie case.

To establish a prima facie case with respect to his termination, however, Brinkman must also demonstrate that there is some additional evidence that age or sex was a factor in Andersen's decision to outsource Brinkman's position.  *Stidham*, 399 F.3d at 938. Brinkman may satisfy this burden by showing either "statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees)."  *Id.*  Brinkman has made neither showing here.  Twenty-six other Andersen employees were terminated when it outsourced its help desk.  Thirteen were younger than defendant, and thirteen were older.  Nine were women.  The Court finds the statistical evidence here insufficient to establish that age or sex was a factor in defendant's decision to outsource Brinkman's help desk position.  The record shows instead that Andersen had considered whether to outsource its help desk beginning in 2004 and continuing through 2005.  Nor has Brinkman pointed to evidence of comments or practices that suggest Andersen had a preference for men or women, or for younger employees.  Rather, the outsourcing of the help desk impacted men and women roughly equally, and impacted employees who were younger than Brinkman.  In sum, even

- 14 -

viewing the facts in a light most favorable to Brinkman, the Court finds no additional evidence that age or sex was a factor in Andersen's decision to outsource Brinkman's position.

Because Brinkman has failed to establish a prima facie case of discrimination, the Court need not determine whether Andersen had a legitimate, non-discriminatory reason for his termination, and whether that reason is a pretext. Nonetheless, the Court notes that Andersen had considered whether to outsource its help desk in 2004 and 2005, and the record supports Andersen's contention that it ultimately determined that outsourcing would allow its IT organization to focus on other priorities and to improve customer service. Courts have consistently upheld such decisions as providing a sufficiently legitimate, non-discriminatory reason for the challenged employment action. *See, e.g.*, *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 716 (8th Cir. 2000) (finding employer's reduction in force decision to reduce costs and improve efficiency constitutes legitimate, non-discriminatory reason). Further, Brinkman has come forward with no evidence suggesting that Andersen's reduction in force rationale is a mere pretext for discrimination. As discussed above, there is insufficient evidence suggesting that age or sex was a causal factor in the decision to terminate Brinkman's employment.

In sum, the Court concludes that Brinkman has not established a prima facie case of age or sex discrimination. As a result, the Court grants Andersen's motion for summary judgment on these claims.

- 15 -

## III.   RETALIATION CLAIMS

Brinkman next argues that Andersen retaliated against him in response to his complaints about age and sex discrimination.   As with his discrimination claims, Brinkman may prove retaliation by indirect evidence through application of the burden-shifting framework under *McDonnell Douglas*.   *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1048 (8th Cir. 2005).   However, following the Supreme Court's decision in *Burlington Northern and Santa Fe Railway v. White*, 548 U.S. 53, 68 (2006), the requirements for establishing a prima facie case of retaliation are slightly different than for a discrimination claim.   Under *Burlington Northern*, to establish a prima facie case of retaliation Brinkman must show (1) he engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.   *See id.* Thus, the fact that Brinkman did not suffer an adverse employment action – apart from his termination – in the context of his discrimination claims does not necessarily preclude a prima facie case of retaliation.   *Higgins v. Gonzalez*, 481 F.3d 578, 589 (8th Cir. 2007).

The "materially adverse" prong is objective, requiring the Court to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions.   *Burlington Northern*, 548 U.S. at 68.   The Court must "separate significant from trivial harms," and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."   *Id.*; *Higgins*, 481 F.3d at 589-90 (noting that personality

conflicts that generate antipathy in the workplace and snubbing by supervisors and co-workers generally do not constitute materially adverse employment action).

Andersen concedes that Brinkman engaged in protected conduct by complaining about sex and age discrimination on various occasions, but disputes that Brinkman suffered any materially adverse employment action apart from his actual termination on October 5, 2005.  Brinkman points to the following incidents as constituting materially adverse employment actions: his removal from a special project that he had worked on for three months; statements by his managers that he should drop his complaints and move on; Andersen's monitoring of his computer use after he was falsely accused of a computer security breach; issuance of a written warning after Andersen discovered he was accessing personal email in violation of company policy; and placing him on paid administrative leave on September 29, 2005, three business days before his scheduled termination date on October 5, 2005.  Andersen argues that none of these actions are materially adverse under *Burlington Northern* because they would not have dissuaded a reasonable employee from making a discrimination complaint.

The Court agrees with Andersen that, apart from Brinkman's termination, the alleged employment actions are not materially adverse for purposes of establishing a prima facie case of retaliation.  In particular, the Court finds that placing an employee on paid administrative leave, three business days before his anticipated termination date, would not dissuade a reasonable employee from making a discrimination complaint.  *See Scott v. Metro. Health Corp.*, 234 Fed. Appx. 341, 349 (6th Cir. 2007) (finding that placing an employee on paid administrative leave was not a materially adverse

employment action for purposes of retaliation claim); *see also Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891-92 (8th Cir. 2005) (holding in pre-*Burlington Northern* case that employee did not suffer adverse employment action when he was placed on administrative leave and maintained his pay, grade, and benefits).  Had Brinkman applied for other, unfilled positions within Andersen, or had employment applications pending at the time of his leave, such that Brinkman reasonably believed that he might retain employment at Andersen, the suspension with pay may well have dissuaded him from going forward with his discrimination complaints.  However, the record demonstrates that Brinkman was no longer considering other employment within Andersen at the time of the administrative leave, and his impending October 5, 2005 termination was all but certain.  Under these circumstances, the Court agrees with Andersen that the early administrative leave would not have dissuaded Brinkman from making a discrimination complaint.

The Court is also not persuaded that monitoring an employee's computer use, providing written warnings for alleged violations of company policy, or telling an employee to move on after repeated complaints would, in these circumstances, deter a reasonable employee from complaining about discrimination.  *See, e.g.*, *Delena v. Verizon New York, Inc.*, No. 02-CV-0372C(F), 2007 WL 2973583, at *14 (W.D.N.Y. Oct. 10, 2007) (finding close monitoring and reprimands of employee were not materially adverse employment actions); *Washington v. Norton*, No. 3:04CV104, 2007 WL 1417290 (N.D.W. Va. 2007) (finding that issuance of disciplinary letters and reprimanding for unprofessional conduct would not dissuade reasonable employee from filing

discrimination complaints).  With respect to Andersen's removal of Brinkman from a project, the Court notes that Cherry had asked Brinkman to participate on the project more than six months after he began complaining of discrimination, and that Brinkman was removed from the project on the very day that Andersen determined he had violated a computer security policy.  The Court finds that a reasonable employee in similar circumstances would not be deterred from complaining about discrimination in light of such actions.  Indeed, the record in this case suggests that these actions did not deter Brinkman from complaining, as he continued to pursue his grievances through all levels of Andersen management and eventually filed a charge with the EEOC.

The Court therefore concludes that the only materially adverse employment action here was Brinkman's termination on October 5, 2005.  With respect to the termination, Andersen contends that Brinkman's prima facie case fails because he can point to no evidence establishing a causal link between his protected conduct and his termination. Brinkman argues that the fact that he was placed on administrative leave just three business days before his position was outsourced itself suggests a causal link between his complaints and his ultimate termination.  Brinkman notes in particular that Andersen received notice of his EEOC charge on September 7, 2005, just shortly before he was placed on administrative leave on September 29, and that he had been complaining to upper levels of Andersen management throughout this time.  Brinkman also contends that he did not deactivate monitoring software or violate Andersen computer policies on September 29, 2005, but suggests instead that it was the installation of new anti-virus software approved by Cherry that resulted in deactivation of the software.

The Court disagrees that this evidence is sufficient to show a causal connection between Brinkman's discrimination complaints and his October termination.  The record demonstrates that Andersen had begun contemplating outsourcing the computer help desk as early as 2004, and as discussed above, Andersen's outsourcing impacted both male and female employees, as well as employees both older and younger than Brinkman.  Even accepting that Brinkman did not in fact violate Andersen computer policies on September 29, 2005, such evidence does not by itself suggest that Brinkman's complaints of sex or age discrimination were a causal factor in his termination, but simply begs the question why Brinkman was placed on administrative leave.  Andersen has pointed to various factors, including Brinkman's disruptive behavior, his prior computer violations, and his refusal to accept the conclusions of Andersen management,[7] to support its action.  Brinkman, on the other hand, has pointed only to the temporal proximity between the EEOC charge and his administrative leave, which alone is insufficient to establish a causal connection for a prima facie case.  *See Feltman v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997).

In sum, even viewing the facts in a light most favorable to Brinkman, the Court finds no causal connection between Brinkman's complaints and his October 5, 2005

---

[7] Although Brinkman's complaints and EEOC charge are surely instances of protected conduct, the record suggests that his refusal to accept the conclusions of various managers who reviewed his complaints, and his persistence in raising the same issues over the course of many months, had itself become a source of disruption in the workplace. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) ("[A]lthough contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.").

termination.[8]   Accordingly, the Court concludes that Brinkman has not demonstrated a prima facie case of retaliation for his complaints of sex and age discrimination.   The Court therefore grants Andersen's motion for summary judgment on Brinkman's retaliation claim.

## ORDER

Based on the foregoing, all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that defendant's Motion for Summary Judgment [Docket No. 29] is **GRANTED**.   **IT IS FURTHER ORDERED** that plaintiff's complaint [Docket No. 1] is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:   September 2, 2008
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge

---

[8] For these same reasons, even if Brinkman were able to establish a prima facie case of retaliation, the record shows Andersen had a legitimate, non-discriminatory reason for Brinkman's termination, namely, its reduction in force decision to improve business operations. *See, e.g.*, *Taylor v. QHG of Springdale, Inc.*, 218 F.3d 898, 900 (8th Cir. 2000).   Moreover, Brinkman has come forward with no evidence suggesting that Andersen's proffered reason is pretextual.